UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDRA BASTIEN, ROUDY BELUS, MARIBEL CASTRO VELAZQUEZ, TONI GABRIEL, MAURICE JOHNSON, MARLO LARRY, DONNA LEE, COURTNEY MYLES and CARLA VICENTE, in her personal capacity and on behalf of her minor child, DESTINY RAMOS,<br><br>               Plaintiffs,<br><br>   v.<br><br>WAL-MART STORES, INC.,<br>               Defendant. | Civil Action<br>No. 05-CV-11468-MDW |

**PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT**

Plaintiffs Bastien, Belus, Castro Velazquez, Gabriel, Johnson, Larry, Lee, Myles and Vicente move, pursuant to Fed. R. Civ. P. 15(a), for leave to file the proposed First Amended Complaint, which is attached to this motion at Exhibit A.

Plaintiffs' proposed First Amended Complaint seeks to add three additional plaintiffs, who, like the original plaintiffs, were minority customers of defendant Wal-Mart Stores, Inc. ("Wal-Mart") who were targeted and falsely accused of shoplifting by Wal-Mart solely on account of their race, color or nationality. Granting plaintiffs' motion will cause neither delay nor prejudice. In addition, the claims of the proposed additional plaintiffs are logically related to the claims of the original plaintiffs and share questions of law and fact, thus satisfying the joinder requirements set forth in Fed. R. Civ. P. 20(a).

Counsel for plaintiffs certifies that, pursuant to Local Rule 7.1, on September 1, 2005, she conferred with counsel for defendant by telephone in order to narrow the issues in dispute

and that she further requested that Wal-Mart withdraw its motion to sever.  Wal-Mart declined to assent to this motion to amend or to withdraw its motion to sever.

### REQUEST FOR ORAL ARGUMENT.

Plaintiffs hereby request oral argument on this motion.

By their attorneys:

/s/ Cara M. Cheyette
Ruth T. Dowling (BBO #645568)
Cara M. Cheyette (BBO #648107)
Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100

Barbara J. Dougan (BBO # 558392)
Lawyers' Committee For  Civil Rights
Under Law of the Boston Bar Association
294 Washington Street, Suite 443
Boston, MA 02108
(617) 482-1145

Anne-Marie G. Harris (BBO #557862)
Salem State College
School of Business
352 Lafayette Street
Salem, MA 01970
(978) 542-6823

September 26, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

ALEZALEE AYALA, ALEXANDRA
BASTIEN, ROUDY BELUS,
MARIBEL CASTRO VELAZQUEZ, TONI
GABRIEL, MAURICE JOHNSON, MARLO
LARRY, DONNA LEE, COURTNEY
MYLES, CHRIS SANDIFORD, MICHELLE
TYLER and CARLA VICENTE, in her
personal capacity and on behalf of her minor
child, DESTINY RAMOS,

                           Plaintiffs,

     v.

WAL-MART STORES, INC.,

                     Defendant.

---

## FIRST AMENDED COMPLAINT

### Introduction.

1.      This lawsuit arises from a pattern and practice of discrimination by the defendant,

Wal-Mart Stores, Inc. and its agents (collectively, "Wal-Mart") against Wal-Mart customers who

are members of racial and ethnic minority groups or who are associated with members of racial

and ethnic minority groups.  Wal-Mart repeatedly singled out, falsely accused, searched,

threatened and, in at least one case, physically restrained these minority shoppers on baseless

suspicions of shoplifting.  Similarly situated white customers were not treated in such a manner.

Wal-Mart's discrimination against the plaintiffs on the basis of their race, color and/or national

origin violated the United States and Massachusetts Constitutions, various federal and state

statutes, Wal-Mart's own policies, as well as Wal-Mart's common law duties toward the

plaintiffs.

**Jurisdiction and Venue**

2.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1332.  The amount in controversy as to each plaintiff exceeds $75,000 exclusive of interest and costs.

3.     Venue is proper in the District of Massachusetts under 28 U.S.C. §§ 1391(b) and (c).

**Parties**

4.     Plaintiff Alezalee Ayala is a 23-year old Puerto Rican woman who lives in Lowell, Massachusetts.

5.     Plaintiff Alexandra Bastien is an 18-year old Haitian American who lives in Brockton, Massachusetts.

6.     Plaintiff Roudy Belus is a 42-year old Haitian man who lives in Brockton, Massachusetts.  Mr. Belus was married to plaintiff Maribel Castro Velazquez at all relevant times.

7.     Plaintiff Maribel Castro Velazquez is a 41-year old Mexican national who currently resides in Mexico City, Mexico.  Ms. Castro Velazquez was married to plaintiff Roudy Belus at all relevant times.

8.     Plaintiff Toni Gabriel is an 18-year old Trinidadian American who lives in Brockton, Massachusetts.

9.     Plaintiff Maurice Johnson is a 30-year old African American man who lived in Brockton, Massachusetts at all relevant times but who currently lives in Alexandria, Virginia.

10.     Plaintiff Marlo Larry is a 42-year old African American woman who lives in Brockton, Massachusetts.

252517.1

11.     Plaintiff Donna Lee is a 46-year old African American woman who lives in Brockton, Massachusetts.

12.     Plaintiff Courtney Myles is an 18-year old Caucasian woman who lives in Brockton, Massachusetts.

13.     Plaintiff Chris Sandiford is a 34-year old Barbadian/Bajan man who lives in Brockton, Massachusetts.

14.     Plaintiff Michelle Tyler is a 41-year old African American woman who lives in Randolph, Massachusetts.

15.     Plaintiff Carla Vicente is a 32-year old Cape Verdean woman who lives in Brockton, Massachusetts.  Ms. Vicente is suing on her own behalf and on behalf of her minor child, Destiny Ramos, who was 13-years old at the time of the incident.

16.     Defendant Wal-Mart is a Delaware corporation with its principal place of business in Bentonville, Arkansas.  Wal-Mart, a discount retailer, conducts business throughout the United States.  On information and belief, as of January 1, 2005, Wal-Mart owned and operated 3,066 discount stores and super centers in the United States alone, including Wal-Mart Store #2122 (the "Avon Wal-Mart"), located in Avon, Massachusetts, and Wal-Mart Store #2222 (the "Tewksbury Wal-Mart"), located in Tewksbury, Massachusetts, the sites of the incidents of discrimination complained of by the plaintiffs.

17.     Wal-Mart committed, authorized, encouraged, sanctioned, ratified, and approved the unlawful policies, actions, and conduct described in this Complaint.

18.     At all relevant times, Wal-Mart's employees and managers were acting in their capacities as employees, agents, and/or representatives of Wal-Mart.

252517.1

19.     At all relevant times, Wal-Mart's employees and managers were acting within the scope of their employment.

20.     At all relevant times, Wal-Mart's employees and managers were under the authority, control and supervision of Wal-Mart.

## Factual Background

**Discrimination Against Ayala**

21.     On or about September 27, 2002, Alezalee Ayala went shopping with her mother, father and young brother at the Tewksbury Wal-Mart.

22.     While the family was shopping in the women's clothing department, Ms. Ayala, became aware that she was being watched and followed by a white female and a white male who, on information and belief, were Wal-Mart employees.  Everywhere Ms. Ayala moved, these employees moved with her.

23.     Ms. Ayala confronted the two Wal-Mart employees and asked them why they were following her.  The female employee accused Ms. Ayala of shoplifting an item from the cosmetics department.

24.     Ms. Ayala had not been in the cosmetics section.  In addition, Ms. Ayala was carrying no purse, had no pockets, and was wearing clothes that permitted any reasonable person to determine, on the basis of a quick visual inspection, that she was not concealing any merchandise on her person.

25.     Ms. Ayala pointed these facts out to the two employees but they insisted that they were permitted to stand next to her and follow her while she shopped.

26.     Ms. Ayala demanded that the employees call the police if they believed that she had stolen Wal-Mart merchandise and to check the store's surveillance tapes so they could see that she had not stolen anything.  The employees refused to do so and persisted in following her.

27.     Ms. Ayala became increasingly agitated and upset and decided to call the police to report this harassment.  With the two employees still trailing closely behind her, Ms. Ayala and her family went to the customer service desk at the front of the store.  Ms. Ayala told the Wal-Mart employee at the customer service desk what had happened and asked to use Wal-Mart's telephone to call the Tewksbury Police.

28.     When the police arrived, they refused to frisk Ms. Ayala or issue a report against her for shoplifting.  Ms. Ayala, however, filled out a statement against Wal-Mart.

29.     The confrontation between Ms. Ayala, the Tewksbury police, and the Wal-Mart employees was conducted near the store's entrance as many other customers looked on.  Because the entire incident had been so publicly humiliating and upsetting, Ms. Ayala and her family abandoned the cart with all of the merchandise they had intended to purchase at the customer service counter, and they immediately left the store.

**Discrimination Against Bastien, Gabriel and Myles**

30.     On or about September 29, 2003, Alexandra Bastien, Toni Gabriel and Courtney Myles went to the Avon Wal-Mart to shop for sweatpants for Ms. Myles.

31.     Ms. Bastien and Ms. Gabriel are black; Ms. Myles is white.  All three teens are close friends who attended the same school and had often shopped together at this Wal-Mart.

32.     Soon after they were looking at sweatpants, Ms. Bastien, Ms. Gabriel and Ms. Myles became aware that they were being watched by a white female Wal-Mart employee.

33.     The surveillance made the three teens uncomfortable.

34.    When the three girls did not find a pair of suitable sweatpants, they started browsing through the music and make-up departments.  As they browsed through Wal-Mart's merchandise, they realized they were still under surveillance.

35.    The girls then decided to leave the store without having made any purchase.

36.    Before the three girls reached the exit door, however, and without any security alarm having sounded, the same white female employee who had been watching them ordered them to stop.  This employee demanded to search Ms. Bastien's  purse and demanded that Ms. Gabriel empty her pockets.  The two teens complied.

37.    Although Ms. Myles was standing in between Ms. Bastien and Ms. Gabriel during the search, and although she was carrying a purse and had on clothing with pockets, the white female employee ignored Ms. Myles and made no attempt whatsoever to search Ms. Myles' purse or pockets.

38.    Upon information and belief, Wal-Mart's own policies prohibit its employees from, among other things, searching Wal-Mart's customers or its customers' personal belongings.

39.    The search of Ms. Bastien and Ms. Gabriel was conducted near the front of the store in view of other customers.  All three girls were deeply humiliated by this very public search and detention.

40.    The employee found no Wal-Mart merchandise in Ms. Bastien's purse or on Ms. Gabriel's person.  None of the three girls had shoplifted any Wal-Mart merchandise.

41.    A white male Wal-Mart employee who was, on information and belief, an Assistant Manager, observed the entire incident and failed to intervene.  This employee refused

- 6 -

Ms. Gabriel's request to speak to the store manager, and then followed the three girls out of the store as if they had engaged in some wrongdoing.

**Discrimination Against the Beluses**

42.     Just two days earlier, on or about September 27, 2003, Roudy Belus, Maribel Castro Velazquez (who was then known as Maribel Belus), and Mr. Belus's 8 year-old daughter went shopping at the Avon Wal-Mart.

43.     Mrs. Belus wore a small nylon backpack on her back that functioned as a purse. Mrs. Belus did not open her backpack at any time while in the store.

44.     Mr. and Mrs. Belus purchased several items.  Before they had exited the store, a white female Wal-Mart employee ordered the Beluses to stop, even though the security alarm had not sounded. The employee claimed that she needed to search Mrs. Belus's backpack.

45.     The Wal-Mart employee searched inside Mrs. Belus's backpack and removed a container of hair coloring that bore the tag of another store.  The employee interrogated Mr. and Mrs. Belus about the hair coloring and demanded to see a receipt from the other store.  During this interrogation, many other shoppers were forced to walk around the Beluses while leaving the store.

46.     Upon information and belief, Wal-Mart's own policies prohibit its employees from, among other things, searching Wal-Mart's customers or its customers' personal belongings.

47.      White shoppers were permitted to leave without being stopped or searched.

48.     Mr. Belus complained to the two white female Wal-Mart managers who had joined the first employee, each of whom stated that the employee was "just doing her job."  One

- 7 -

of the managers claimed that Wal-Mart had posted a sign advising shoppers that all backpacks must be checked.

49.    Upon information and belief, no such sign had been posted at the Avon Wal-Mart prior to the time Mr. and Mrs. Belus entered the store.

50.    Although Mr. and Mrs. Belus had paid for each item in their possession, on information and belief, Wal-Mart personnel called the police to report that Wal-Mart had detained shoplifters.  When the police arrived, Mr. Belus's daughter began to tremble and cry. Other shoppers continued to stare at the family.  Mr. and Mrs. Belus felt even more humiliated as they were publicly questioned by the police.

51.    The police refused to charge the Beluses with shoplifting.

**Discrimination Against Lee and Larry**

52.    On or about December 20, 2002, Marlo Larry and Donna Lee went shopping together at the Avon Wal-Mart.  The store was particularly crowded due to the upcoming holidays.  Most of the shoppers were white.

53.    Due to the crowds at the registers, Ms. Lee and Ms. Larry purchased their items at the  jewelry counter.  Together, their purchases totaled several hundred dollars.

54.    After paying for their items, Ms. Lee and Ms. Larry headed toward the exit with their shopping bags in a cart.  Ms. Lee and Ms. Larry started to exit the store at the same time as several white shoppers who also had bags of merchandise.  As this group of shoppers passed through the gate, the security alarm sounded.

55.    A white male Wal-Mart employee stopped Ms. Lee and Ms. Larry at the door and demanded to see receipts for their purchases.  He did not stop any of the white shoppers who were also passing through the doors when the alarm sounded.

56.     In full view of other shoppers, the Wal-Mart employee opened Ms. Lee's and Ms. Larry's shopping  bags and compared each of their purchased items one by one with their itemized receipts.

57.     Ms. Lee and Ms. Larry had paid for every item in their possession.

58.     After their bags were searched, Ms. Lee and Ms. Larry tried, for the second time, to leave the store.  Again, they went through the doors with other white shoppers.  Again, the alarm sounded, and again Ms. Lee and Ms. Larry were singled out by the same white male employee as suspected shoplifters, even though he had just searched their bags moments before. White customers exiting at the same time were not stopped.

59.     A police officer, who upon information and belief was being paid by Wal-Mart to serve as store security, ordered Ms. Lee and Ms. Larry back inside the store.  In the presence of Wal-Mart employees, he claimed that Wal-Mart had a videotape that showed Ms. Lee and Ms. Larry shoplifting.

60.     Wal-Mart's employees were silent in response to the claim by the police officer that Wal-Mart had a videotape that showed Ms. Lee and Ms. Larry shoplifting.

61.     Upon information and belief, no such video tape existed.  Even if such a video tape existed, it did not show Ms. Lee and Ms. Larry shoplifting.

62.     By this time, additional Wal-Mart employees were involved, all of whom were white.  The Wal-Mart employees searched Ms. Lee's and Ms. Larry's shopping bags for a second time.  They also searched the women's purses and wallets, and even opened the inner zippered compartments in Ms. Larry's wallet.

252517.1

63.    Upon information and belief, Wal-Mart's own policies prohibit its employees from, among other things, searching Wal-Mart's customers or its customers' personal belongings.

64.    The searches and questioning of Ms. Lee and Ms. Larry were conducted near the store's entrance as many other customers looked on.  Ms. Lee was crying and both she and Ms. Larry were deeply angered and humiliated by their treatment at the hands of the Wal-Mart employees.

65.    Again, no stolen merchandise was found, and Ms. Lee and Ms. Larry were finally allowed to leave the Avon Wal-Mart.

66.    Although the Avon Wal-Mart is a very short drive from each of their homes, both women now often drive upwards of thirty minutes for the kind of shopping they previously did at the Avon Wal-Mart in order to avoid returning to that store.

**Discrimination Against Johnson**

67.    On or about July 3, 2003, Maurice Johnson went shopping at the Avon Wal-Mart.

68.    Mr. Johnson bought several items and proceeded toward the exit.

69.    Before he reached the exit or the security sensors, a white female Wal-Mart employee stopped Mr. Johnson, grabbed his cart, and demanded to check his shopping bag.  Mr. Johnson was the only non-white shopper leaving the store at the time and the only shopper stopped by the employee.

70.    The Wal-Mart employee told Mr. Johnson that she stopped him to search his bag in accordance with "store policy."

- 10 -

71.     Upon information and belief, Wal-Mart had no policy at the time of the incident that authorized or required a search prior to the customer exiting the store and where no alarm has sounded.

72.     The search of Mr. Johnson's bag was conducted near the front of the store in view of other customers.  Mr. Johnson was deeply humiliated by this very public search and detention.

73.     Mr. Johnson had paid for every purchase in his possession.

74.     Mr. Johnson sought the assistance of two white male Wal-Mart employees who were standing nearby, whom he believed to be managers.  These employees offered no explanation or assistance.  In response to Mr. Johnson's request for the name of the store manager, these employees told him it would be useless to contact the store manager in light of the purported store policy.

75.     Although the Avon Wal-Mart was just a short drive from his home, between the date of the incident and when he moved from the area, Mr. Johnson never returned to the Avon Wal-Mart and instead, was forced to drive out of his way to shop elsewhere.

**Discrimination Against Sandiford**

76.     In March 2005, Chris Sandiford stopped at the Avon Wal-Mart around dinner time on his way home from work.

77.     As soon as he entered the store, Mr. Sandiford noticed a white male and a white female standing near the door dressed in street clothes.  On information and belief, these two individuals were Wal-Mart security guards.

78.     The female security guard turned and started following Mr. Sandiford as soon as he left the front door and had headed toward the aisles.

79.    As Mr. Sandiford shopped, the female security guard stood very close by in the same aisle and watched him intently.  When Mr. Sandiford moved to another aisle, this security guard trailed behind him.

80.    Mr. Sandiford started become agitated as a result of this surveillance, at which point, Mr. Sandiford observed the female security guard speaking into what appeared to be a radio.  Shortly thereafter, Mr. Sandiford realized that the male security guard had joined the female security guard and that he was now under surveillance by both of them.

81.    As a result of this hostile and wholly unwarranted surveillance, Mr. Sandiford took his shopping basket to the customer service counter and complained to a white, female Wal-Mart employee about this discriminatory treatment.  A white, female Wal-Mart manager came over and Mr. Sandiford complained to her about this treatment.

82.    Eventually, Mr. Sandiford, the Wal-Mart manager and Wal-Mart's two security guards convened at the front of the store.  Mr. Sandiford demanded that the security personnel explain their criteria for following customers and challenged them to identify a basis for their surveillance other than the fact that he was black.  He received no satisfactory explanation.

83.    The Wal-Mart manager asserted that the security guards were Wal-Mart's "corporate" security personnel  The manager gave Mr. Sandiford a telephone number where Mr. Sandiford could lodge a complaint about the security guards' conduct.

84.    The altercation between Mr. Sandiford and the Wal-Mart personnel took place in clear view and within earshot of other customers.  Mr. Sandiford was deeply humiliated by having to defend himself in public against baseless suspicions of shoplifting.

85.    Mr. Sandiford reluctantly purchased those items in his shopping basket for which he had an immediate need, and he left the store.  Shortly thereafter, Mr. Sandiford called the

- 12 -

telephone number that the Wal-Mart manager had provided to Mr. Sandiford.  Although he left a

telephone message at that number, Wal-Mart never returned his call.

**Discrimination Against Tyler**

86.     In early 2004, Michelle Tyler went to the Avon Wal-Mart her 1½ year old baby to

buy household goods.

87.     Mrs. Tyler was carrying her baby in one arm and her baby's diaper bag over her

other shoulder.  When she tried to enter the store, Mrs. Tyler was stopped at the door by a white

male Wal-Mart employee who told her that she could not enter the store unless she permitted the

employee to search Mrs. Tyler's bag to make sure that it was "empty."

88.     Upon information and belief, Wal-Mart had no policy that authorized or required

a search prior to the customer entering the store.

89.     Mrs. Tyler objected to being searched but the employee insisted that this was

"store policy."  Mrs. Tyler again objected and pointed out that the Wal-Mart employee had not

stopped a white woman who had just entered the store ahead of Mrs. Tyler whose bag was at

least as large as, if not larger than, Mrs. Tyler's diaper bag.

90.     The employee ignored Mrs. Tyler and simply continued to repeat his demand – he

needed to search Mrs. Tyler's  bag or she would not be permitted to enter the store.  Mrs. Tyler

asked to speak with a manager.

91.     A white male approached who, on information and belief, was a Wal-Mart

manager.  The manager ignored Mrs. Tyler's protests and simply repeated the demand of the first

employee.

92.     The Wal-Mart manager then reached for Mrs. Tyler's bag.  Mrs. Tyler quickly

pulled herself back from the manager and exclaimed that the manager was not to touch her

personal property.  When the manager denied having reached for her bag, Mrs. Tyler pointed at a surveillance camera near the door, and challenged him to see it for himself on the tape.

93.     The manager again ignored Mrs. Tyler by repeating her options: consent to a search or leave the store.  Mrs. Tyler left the store and was therefore unable to purchase any of the items that she had come to the store to buy.

94.     On subsequent visits to the Avon Wal-Mart, Mrs. Tyler has found herself leaving essential personal items in her car rather than carry a bag into the store in order to avoid being again subjected to harassment by Wal-Mart employees or, alternatively, denied entry into the store.

**Discrimination Against Vicente and Ramos**

95.     On or about August 30, 2003, Carla Vicente went to the Avon Wal-Mart with her four children, ages 2, 7, 10 and 13, and her 11-year old niece to buy school supplies and backpacks.

96.     While the cashier was in the process of ringing up Ms. Vicente's purchases, a white female Wal-Mart employee approached Ms. Vicente and began to empty Ms. Vicente's shopping bags that the cashier had already placed in Ms. Vicente's cart.  The employee held up three pens and a small bottle of glue and loudly asked, "What's this?"  Other customers turned to watch at the sound of the Wal-Mart employee's voice.

97.     Ms. Vicente was not sure if she had already paid for these items or if perhaps her 7-year old had placed them in the backpack she was buying for him. She told the cashier she only intended to buy the glue.

- 14 -

98.     As the white female continued to empty out and go through Ms. Vicente's purchases after the cashier had bagged them, the cashier advised Ms. Vicente that the employee in question "does that to all the blacks and minorities" or words to that effect.

99.     Ms. Vicente paid over $200 for all of the items that she intended to purchase.

100.     Ms. Vicente approached a Wal-Mart store manager to complain about the white female employee's actions.  The store manager told her that the employee was "just doing her job" and he threatened to charge Ms. Vicente with shoplifting if she did not "shut up."  When Ms. Vicente became upset, the manager called the police.

101.     Dozens of other customers at the various cash registers were staring at Ms. Vicente and her children.  The children were frightened and some were crying.

102.     Ms. Vicente told the Wal-Mart employees that she wanted to return everything that she had just purchased and demanded a refund.

103.     The Wal-Mart employees refused to refund Ms. Vicente's money.

104.     Ms. Vicente instructed her 13-year old daughter, Destiny Ramos, to go to their car and retrieve Ms. Vicente's cell phone.

105.     Three white male Wal-Mart employees blocked the door to prevent Destiny from leaving the store.  One of those male Wal-Mart employees physically restrained the young girl by placing his hand on her chest.

106.     Upon information and belief, Wal-Mart's own policies prohibit the touching or grabbing of a customer.  Upon information and belief, Wal-Mart had no policy that authorized or required a search prior to the customer exiting the store and where no alarm has sounded.

252517.1

107.    The entire family was prevented from leaving the store until the police arrived. Customers who were exiting the store stared at them.  The entire family was extremely distraught.

108.    When the police arrived, they refused to press charges against Ms. Vicente.  Only then were Ms. Vicente and the children permitted to leave the store.

109.    Ms. Vicente was banned from the Avon Wal-Mart store and was told by Wal-Mart that if she returns she will be arrested for trespassing.

**Count I**
**(42 U.S.C. § 1981 –Contracts Clause)**

110.    The plaintiffs adopt by reference the allegations contained in ¶¶ 1-109 above.

111.    Each of the plaintiffs is a member of a racial or ethnic minority group or was, at the time of the incident, associated with a member of a racial or ethnic minority.

112.    Wal-Mart intentionally and purposefully discriminated against each plaintiff other than Ms. Myles on the basis of his or her race, color and/or national origin.

113.    Wal-Mart intentionally and purposefully discriminated against Ms. Myles on the basis of her association with Ms. Bastien and Ms. Gabriel, who are members of ethnic and/or racial minorities.

114.    Each of the plaintiffs was denied the ability to make, perform, modify or terminate a contract, as defined by 42 U.S.C. § 1981(b), by reason of race-based animus.

115.    Wal-Mart acted in bad faith and with callous indifference to the plaintiffs' federally protected rights.

116.    The plaintiffs have suffered injuries as a result of Wal-Mart's unlawful conduct.

117.    Each of the plaintiffs is entitled to relief of compensatory and punitive damages under 42 U.S.C. § 1981.

- 16 -

118.   Each of the plaintiffs is entitled to a reasonable attorney's fee under 42 U.S.C. §
1988.

## Count II
### (42 U.S.C. § 1981 – Equal Benefits Clause)

119.   The plaintiffs adopt by reference the allegations contained in ¶¶ 1-118 above.

120.   Each of the plaintiffs is a member of a racial or ethnic minority group or was, at
the time of the incident, associated with a member of a racial or ethnic minority.

121.   Wal-Mart intentionally and purposefully discriminated against each plaintiff other
than Ms. Myles on the basis of his or her race, color and/or national origin.

122.   Wal-Mart intentionally and purposefully discriminated against Ms. Myles on the
basis of her association with Ms. Bastien and Ms. Gabriel, who are members of ethnic and/or
racial minorities.

123.   Each of the plaintiffs was denied the ability to enjoy all the benefits, privileges,
terms, and conditions of the contractual relationship, as defined by 42 U.S.C. § 1981(b), by
reason of race-based animus.

124.   Wal-Mart acted in bad faith and with callous indifference to the plaintiffs'
federally protected rights.

125.   The plaintiffs have suffered injuries as a result of Wal-Mart's unlawful conduct.

126.   Each of the plaintiffs is entitled to relief of compensatory and punitive damages
under 42 U.S.C. § 1981.

127.   Each of the plaintiffs is entitled to a reasonable attorney's fee under 42 U.S.C. §
1988.

## Count III
### (42 U.S.C. § 1982 – Equal Right to Purchase, Hold, or Convey Personal Property )

128.    The plaintiffs adopt by reference the allegations contained in ¶¶ 1-127 above.

129.    Each of the plaintiffs is a member of a racial or ethnic minority group or was, at the time of the incident, associated with a member of a racial or ethnic minority.

130.    Wal-Mart intentionally and purposefully discriminated against each plaintiff other than Ms. Myles by interfering with each plaintiffs' right to purchase, hold or convey personal property on account of race-based animus.

131.    Wal-Mart intentionally and purposefully discriminated against Ms. Myles by interfering with her right to purchase, hold or convey personal property on account of her association with Ms. Bastien and Ms. Gabriel, who are members of ethnic and/or racial minorities.

132.    Wal-Mart acted in bad faith and with callous indifference to the plaintiffs' federally protected rights.

133.    The plaintiffs have suffered injuries as a result of Wal-Mart's unlawful conduct.

134.    Each of the plaintiffs other than non-citizens Maribel Castro Velazquez and Chris Sandiford is entitled to relief of compensatory and punitive damages under 42 U.S.C. § 1982.

135.    Each of the plaintiffs other than non-citizens Maribel Castro Velazquez and Chris Sandiford is entitled to a reasonable attorney's fee under 42 U.S.C. § 1988.

## Count IV
### (M.G.L. c. 12, § 11I -- Massachusetts Civil Rights Act)

136.    The plaintiffs adopt by reference the allegations contained in ¶¶ 1-135 above.

137.    Wal-Mart interfered with or attempted to interfere with each plaintiffs' rights, including the right to Equal Protection of the laws as secured by the Fourteenth Amendment to the Federal Constitution and Article I of the Massachusetts Constitution, the right to be free from unreasonable search and seizure as secured by the Fourth Amendment to the Federal

Constitution and Article XIV of the Massachusetts Constitution, the right to make and enforce contracts, the right to purchase, hold or convey personal property, and the right to use public accommodations, by threats, coercion or intimidation.

138.    Each plaintiff was harmed by this deprivation of his or her rights.

139.    Each plaintiff is entitled to compensatory damages and costs and attorneys' fees under M.G.L. c. 12, § 11I.

## Count V
## (M.G.L. c. 93A, § 9 – Massachusetts Consumer Protection Act)

140.    The plaintiffs adopt by reference the allegations contained in ¶¶ 1-139 above.

141.    Wal-Mart is a "person" within M.G.L. c. 93A, § 1.

142.    Wal-Mart was and is engaged in "trade" or "commerce."

143.    Wal-Mart engaged in unfair business acts or practices under M.G.L. c. 93A, § 2 when it used race or ethnicity as a factor in its decision to subject each of the plaintiffs to surveillance, detainment, search, and/or to assert against each plaintiff a baseless allegation of shoplifting.

144.    On or about December 10, 2004, plaintiffs Bastien, Belus, Castro Velazquez, Gabriel, Johnson, Larry, Lee and Vicente sent Wal-Mart a demand letter pursuant to M.G.L. c. 93A. This demand letter described the conduct by Wal-Mart that constituted the unfair business acts or practices, the injuries these plaintiffs sustained, and set out, as required by statute, a monetary demand.

145.    By letter dated January 7, 2005, Wal-Mart responded to the plaintiffs' c. 93A demand letter. Wal-Mart's response was unreasonable in part because it tendered no offer of settlement.

146.    On or about August 19, 2005, plaintiffs Ayala, Sandiford and Tyler sent Wal-Mart a demand letter pursuant to M.G.L. c. 93A.  This demand letter described the conduct by Wal-Mart that constituted the unfair business acts or practices, the injuries these plaintiffs sustained, and set out, as required by statute, a monetary demand.

147.    By letter dated September 19, 2005, Wal-Mart responded to the plaintiffs' c. 93A demand letter.  Wal-Mart's response was unreasonable in part because it tendered no offer of settlement.

148.    Each plaintiff is entitled to treble damages and reasonable attorneys' fees and costs.

**Count VI**
**(M.G.L. c. 93, § 102 – Equal Rights Act)**

149.    The plaintiffs adopt by reference the allegations contained in ¶¶ 1-148 above.

150.    Wal-Mart deprived each of the plaintiffs of their rights to make and enforce contracts, to purchase, hold and convey personal property, on the basis of the plaintiffs' race, color or national origin.

151.    Each plaintiff is entitled to compensatory and exemplary damages and costs and reasonable attorneys' fees under M.G.L. c. 93, § 102.

**Count VII**
**(M.G.L. c. 272, § 98 – Discrimination in a Place of Public Accommodation)**

152.    The plaintiffs adopt by reference the allegations contained in ¶¶ 1-151 above.

153.    Wal-Mart discriminated against each plaintiff on account of race, color or national origin in a retail establishment.

154.    Under M.G.L. c. 272, § 92A, a retail establishment is a place of public accommodation.

252517.1

155.    The plaintiffs have suffered injuries as a result of Wal-Mart's unlawful conduct.

156.    Each plaintiff is entitled to damages under M.G.L. c. 272, § 98.

## Count VIII
### (Good Faith and Fair Dealing)

157.    The plaintiffs adopt by reference the allegations contained in ¶¶ 1-156 above.

158.    Each purchase and contemplated purchase made by the plaintiffs constituted a contract between each plaintiff and Wal-Mart.

159.    A covenant of good faith and fair dealing is implied in every contract.

160.    Wal-Mart breached the covenant of good faith and fair dealing when it used race or ethnicity as a factor in its decision to subject each of the plaintiffs to surveillance, detainment, search, and/or to assert against each plaintiff a baseless allegation of shoplifting.

161.    Each plaintiff was harmed by Wal-Mart's breach and is entitled to damages suffered as a consequence of that breach.

## Count IX
### (Common Law False Imprisonment)

162.    The plaintiffs adopt by reference the allegations contained in ¶¶ 1-161 above.

163.    Wal-Mart unreasonably and intentionally detained each of the plaintiffs by force or threat.

164.    Each of the plaintiffs was harmed by the mental suffering, embarrassment, humiliation and mental anguish brought on by the conduct of Wal-Mart.

165.    Each plaintiff is entitled to damages for the harm caused by Wal-Mart.

## Count X
### (Common Law Intentional Infliction of Emotional Distress)

166.    The plaintiffs adopt by reference the allegations contained in ¶¶ 1-165 above.

252517.1

167.    Wal-Mart knew or should have known that singling out minority shoppers to be detained and searched would cause emotional distress.

168.    The conduct of Wal-Mart of singling out and searching only minority shoppers was extreme and outrageous.

169.    The conduct of Wal-Mart was the cause of the plaintiffs' distress.

170.    The plaintiffs suffered severe emotional distress as a result of the conduct of Wal-Mart.

171.    Each of the plaintiffs is entitled to recover damages for the conduct of Wal-Mart.

**Count XI**
**(Common Law Defamation)**

172.    The plaintiffs adopt by reference the allegations contained in ¶¶ 1-171 above.

173.    The words and actions of Wal-Mart imputed the crime of larceny to each of the plaintiffs, which is defamatory *per se*.

174.    Each of the plaintiffs was harmed by the conduct of Wal-Mart.

175.    Each of the plaintiffs is entitled to recover damages for the actions of Wal-Mart.

**Count XII**
**(Assault and Battery as to Destiny Ramos)**

176.    The plaintiffs adopt by reference the allegations contained in ¶¶ 1-175 above.

177.    Wal-Mart used intentional, unconsented to and unjustified force when its employee placed his hand upon Carla Vicente's minor child, Destiny Ramos.

178.    Destiny Ramos was harmed by this unwanted touching.

179.    Destiny Ramos is entitled to recover for the damages caused by Wal-Mart's conduct.

- 22 -

**Requested Relief**

WHEREFORE, the plaintiffs respectfully requests that the Court grant the following relief:

       A.      Award plaintiffs compensatory damages in an amount to be determined at trial for the plaintiffs' losses and injuries;

       B.      Award plaintiffs punitive damages in an amount to be determined at trial that would punish Wal-Mart for its willful, wanton, and reckless conduct and to effectively deter Wal-Mart from engaging in similar conduct in the future;

       C.      Award plaintiffs prejudgment interest;

       D.      Award plaintiffs reasonable attorneys' fees and costs incurred in this action; and

       E.      Award plaintiffs such other relief as the Court deems appropriate and just.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

                  ALEZALEE AYALA, ALEXANDRA BASTIEN, ROUDY BELUS, MARIBEL CASTRO VELAZQUEZ, TONI GABRIEL, MAURICE JOHNSON, MARLO LARRY, DONNA LEE, COURTNEY MYLES, CHRIS SANDIFORD, MICHELLE TYLER, CARLA VICENTE, and DESTINY RAMOS,

                  by their attorneys:

                  /s/ Cara Cheyette
                  Ruth T. Dowling (BBO #645568)
                  Cara M. Cheyette (BBO #648107)
                  PALMER & DODGE LLP
                  111 Huntington Avenue
                  Boston, MA 02199
                  (617) 239-0100

Barbara J. Dougan (BBO # 558392)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW OF THE BOSTON BAR
ASSOCIATION
294 Washington Street, Suite 443
Boston, MA 02108
(617) 482-1145

Anne-Marie G. Harris (BBO #557862)
SALEM STATE COLLEGE
SCHOOL OF BUSINESS
352 Lafayette Street
Salem, MA 01970
(978) 542-6823

September 26, 2005